**Phillip LONG and David Wood, Plaintiffs,**

v.

**John VAN DE KAMP, Attorney General of the State of California, Defendant.**

**No. CV 89–6488 SVW.**

United States District Court, C.D. California.

Aug. 22, 1991.

Phillip M. Long, in pro. per.

David I. Wood, in pro. per.

Robert D. Breton, Deputy Atty. Gen., Los Angeles, Cal., for John Van de Kamp.

DeWitt W. Clinton, County Counsel, S. Robert Ambrose, Asst. County Counsel, Rafael A. Ongkeko, Principal Deputy County Counsel, Los Angeles, Cal., for County of Los Angeles.

### AMENDED ORDER GRANTING SUMMARY JUDGMENT AND ENJOINING THE ATTORNEY GENERAL FROM ENFORCING AN UNCONSTITUTIONAL STATUTE

WILSON, District Judge.

#### Introduction

The question before the Court is whether section 2805(a) of the California Vehicle Code authorizing warrantless searches without probable cause of automobile repair shops for the purpose of locating stolen vehicles violates the Fourth Amendment to the United States Constitution.

The Court finds the statute to be constitutionally defective in two respects and enjoins the Attorney General from enforcing it against automobile (or motorcycle) repair shops.

#### Background

The plaintiffs operate a motorcycle repair shop known as "Cycle Works." From time to time in the last three years, Cycle Works became the subject of surprise searches carried out by deputy sheriffs of the Los Angeles County and, on occasion, by members of the California Highway Patrol. In each instance, the search was made without a warrant under the authority of section 2805(a) of the California Vehicle Code.

The first search occurred on April 17, 1987. The police officers entered the plaintiffs' business premises, announced their intention to conduct a search pursuant to § 2805, and proceeded to search the repair shop despite plaintiff Long's demands to see a valid search warrant. The search covered areas of the shop not open to the public as well as file cabinets and desk drawers found in the shop's officeroom. During the search the officers disrupted the flow of business in the shop by prohibiting customers from entering or leaving the premises.

The second incident occurred a year later, on November 9, 1988, when the officers again conducted a warrantless search of the plaintiffs' business. The events of the first search were then replayed: the plaintiffs demanded to see a search warrant and the officers, citing § 2805, proceeded to search the entire expanse of the repair shop as well as rifle through office papers and business records. Customers again were turned away from the shop during the search; among those turned away was plaintiff Long's mother who is the owner of the business.

On this second occasion plaintiff Long's persistent demands that the officers either produce a search warrant or leave the premises resulted in his arrest for, among others, obstructing a police officer in the

performance of his duties. That charge was later dismissed.

## Procedural History

In November 1989, plaintiffs Wood and Long, representing themselves, filed a civil rights suit against the County of Los Angeles, the individual officers who carried out the searches, and against the Attorney General of California. The case was assigned to a United States magistrate judge, in accordance with the rules of this Court.

All defendants, except the Attorney General, reached a settlement agreement with the plaintiffs, and the claims against them have been dismissed with prejudice. The sole issue remaining in the case is the constitutionality of § 2805(a), as applied to repair shops. The plaintiffs' prayer for relief is to enjoin the Attorney General from enforcing the statute.

After the dismissal of other defendants, the plaintiffs brought a motion for summary judgment on the constitutional question before the magistrate judge. Their motion was denied. The plaintiffs thereafter filed objections to the magistrate judge's order, and the motion for summary judgment was reset for a hearing before this Court.

Upon reargument, the Court finds that the evidentiary exhibits submitted by the parties in conjunction with the motion for summary judgment show that the operative facts of this case are not in dispute and that the constitutional question can be resolved as a matter of law. *See* F.R.C.P. 56(c).

## Discussion

### A. JURISDICTION AND THE ELEVENTH AMENDMENT

■ The Eleventh Amendment deprives federal courts of jurisdiction to entertain suits by citizens against a state. *See* U.S. Const. amend. XI. The Amendment therefore would present a constitutional conundrum if it were understood to mean that a

citizen could not sue in federal court to enjoin even the patently unconstitutional conduct of a state official. An interpretation of the Eleventh Amendment so inimical to our system of constitutional government, expectedly, was not reached by the Supreme Court.

In *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Supreme Court resolved the conundrum presented by the Eleventh Amendment in favor of the constitutional review of actions of state officials in federal court. The theory of *Ex parte Young* is that a state official acts beyond the scope of the authority granted to him by state law when he engages in unconstitutional conduct. *Id.* 28 S.Ct. at 454. Hence, an injunction of a federal court is not sought against the state, as would be prohibited by the Eleventh Amendment, but against the individual state official acting outside the scope of his authority. *Id.* In *Ex parte Young*, for example, the Supreme Court held that a federal court had jurisdiction to enjoin the Attorney General of Minnesota from enforcing an unconstitutional railroad tariff statute. *Id.*

The present case, in its procedural posture, is indistinguishable from *Ex parte Young*, and the present-day Attorney General of California is no more shielded by the Eleventh Amendment then was the Attorney General of Minnesota in 1908.[1]

The power of the federal courts to enjoin state officials from unconstitutional conduct has been settled law since 1908. Hence, it is a little too late in the day for the Attorney General to press the Eleventh Amendment defense.

### B. THE FOURTH AMENDMENT

#### I. *A Preliminary Glance*

The constitutional review of a state statute is best begun with the words of the Constitution and of the statute in mind.

---

**1.** The Attorney General, who has "direct supervision" over county sheriffs and county district attorneys, is the state official responsible for the execution of the statute whose constitutionality is at issue. *See* Cal.Gov.Code §§ 12560, 12550.

The Fourth Amendment, which is made applicable to the states through the Fourteenth Amendment, provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

The following provision of the California Vehicle Code is assailed as an infringement on the Fourth Amendment:

> (a) For the purpose of locating stolen vehicles, a member of the California Highway Patrol, or a member of a city police department or county sheriff's office whose primary responsibility is to conduct vehicle theft investigations, may inspect any vehicle of a type required to be registered under this code or identifiable vehicle component thereof on a highway or in any public garage, repair shop, terminal, parking lot, new or used car lot, automobile dismantler's lot, vehicle shredding facility, vehicle leasing or rental lot, vehicle equipment rental yard, vehicle salvage pool, or other similar establishment, or any agricultural or construction work location where work is being actively performed, and may inspect the title or registration of vehicles, in order to establish the rightful ownership or possession of the vehicle or identifiable vehicle component.
>
> \*     \*     \*     \*     \*     \*
>
> (c) Whenever possible, inspections conducted pursuant to subdivision (a) or (b) shall be conducted at a time and in a manner so as to minimize any interference with, or delay of, business operations.

Cal.Veh.Code § 2805.

At first blush, § 2805 appears in a single stroke to offend every clause of the Fourth Amendment. First, a search under § 2805 does not require a warrant, nor probable cause, nor any other smaller quantum of suspicion that the person to be searched is or has been engaged in unlawful activity. Second, section 2805 does not "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Hence, the statute amounts to a general warrant authorizing an exploratory rummaging of the business premises in search of stolen vehicles, vehicle parts, and vehicle registration and title papers. *See Boyd v. United States,* 116 U.S. 616, 625, 6 S.Ct. 524, 529, 29 L.Ed. 746 (1886) ("general warrants[s]" are prohibited by the Warrant Clause of the Fourth Amendment); *VonderAhe v. Howland,* 508 F.2d 364, 369 (9th Cir.1974) (the Fourth Amendment prohibits exploratory rummaging for evidence). Third, the manner and the frequency of searches under § 2805 are left to the unbridled discretion of the inspecting officers, so long as the search, "whenever possible," is conducted so as to minimize disruptions to the operation of the business. Cal.Veh.Code § 2805(c); *see Marshall v. Barlow's, Inc.,* 436 U.S. 307, 323, 98 S.Ct. 1816, 1826, 56 L.Ed.2d 305 (1978) (the Fourth Amendment prohibits the delegation of unbridled authority upon executive officers).

## II. *Administrative Search Exception to the Warrant Requirement*

The Fourth Amendment does not terminate at the doorstep of a commercial establishment. "The businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property." *See v. City of Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 1739, 18 L.Ed.2d 943 (1967). However, as the governmental regulation of business enterprise has grown in recent years, so has the need for official entry upon commercial property to ensure compliance with the applicable regulations. In view of the urgent government need to enforce its regulatory regime and of the attenuated expectation of privacy in commercial premises, the Supreme Court has upheld warrantless administrative inspections of business enterprises operating within certain pervasively regulated industries. *See, e.g., New York*

*v. Burger*, 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987). It is on the administrative search exception to the warrant requirement that the Attorney General has pinned his hopes, contending that § 2805 of the California Vehicle Code authorizes valid administrative inspections of automobile repair shops.

The Supreme Court, for example, has found that a long tradition of close government supervision of the liquor industry justified periodic warrantless inspections of liquor dealers. *See Colonnade Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970). Similarly, the Court found that a pawn shop dealer who is federally licensed to sell firearms operates with the knowledge of the pervasive federal regulation of interstate traffic in firearms and must therefore expect the periodic inspection of his business records, firearms and ammunition. *See United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972). On the other hand, the Supreme Court has found that the federal regulation of businesses engaged in interstate commerce is not so pervasive as to justify warrantless inspections of all such businesses for the purpose of enforcing workplace safety regulations. *See Marshall v. Barlow's, Inc., supra*, 98 S.Ct. at 1821.

In *New York v. Burger*, the Supreme Court found automobile junkyards to be a "new branch" of the long-regulated junkyard business, adding the junkyards to the list of pervasively regulated industries. *See New York v. Burger, supra*, 107 S.Ct. at 2646. The regulatory scheme addressed in *Burger* required a junkyard dealer to obtain an operating license, which could be refused if the applicant had previously been convicted of possession of stolen property, and to maintain a "police book" recording the acquisition and disposition of motor vehicles and vehicle parts. *Id.* at 2645–2646. Police officers and agents of the Department of Motor Vehicles were authorized by statute to examine the police book and to compare the entries in the book against the Vehicle Identification Numbers (VINs) of vehicles and vehicle parts found on the premises. *Id.* at 2639–

2640. The inspecting officers in *Burger* conducted an unannounced search of the premises of a junkyard dealer, demanded to see the police book, and then, after the dealer failed to produce the book, proceeded to inspect the VIN numbers of automobiles found in the junkyard. *Id.* at 2640. As a result of evidence uncovered during the search, the dealer was arrested and charged with five counts of criminal possession of stolen property and one count of unregistered operation as a vehicle dismantler. *Id.* The Supreme Court upheld the search against a constitutional challenge as a valid administrative inspection.

However, the administrative inspection doctrine cannot be taken so far as to make an end-run around the Fourth Amendment. "If the primary object of the search is to gather evidence of criminal activity, a criminal search warrant [must] be obtained...." *Michigan v. Clifford*, 464 U.S. 287, 294, 104 S.Ct. 641, 647, 78 L.Ed.2d 477 (1984) (plurality opinion of Powell, J.); *see also Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486 (1978). Administrative inspection schemes were not meant to trump the constitutional guarantees applicable to criminal investigations. *See Abel v. United States*, 362 U.S. 217, 226, 80 S.Ct. 683, 690, 4 L.Ed.2d 668 (1960) ("[t]he deliberate use by the Government of an administrative warrant for the purpose of gathering evidence in a criminal case must meet stern resistance by the courts"); *Cf. New York v. Burger, supra*, 107 S.Ct. at 2644 (an administrative inspection scheme is valid only if it is necessary to further regulatory aims); *Donovan v. Dewey*, 452 U.S. 594, 600, 101 S.Ct. 2534, 2539, 69 L.Ed.2d 262 (1981) (same).

■ Thus, the lawfulness of criminal searches is analyzed under a rigid warrant-probable cause standard, while the guiding principle in analyzing the constitutional limitations upon administrative searches is to "balanc[e] the need to search against the invasion which the search entails." *Camara v. Municipal Court*, 387 U.S. 523, 537, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930 (1967); *see also Ybarra v. Illinois*, 444 U.S. 85, 95, 100 S.Ct. 338, 344, 62 L.Ed.2d

238 (1979) (affirming the requirement of probable cause for searching a person found at the scene of a criminal search warrant execution). This dichotomy creates a fork in the road of constitutional review: the *Clifford* warrant-probable cause requirement is to one side, the *Camara* balancing test is to the other, and the two paths rarely lead to the same conclusion.

### III. *What Searches are Administrative?*

■ If, for instance, the Attorney General had argued that § 2805 is constitutional under the airport search exception, the response to that argument would be plain: a repair shop is not an airport. This is, however, precisely the kind of misguided argument that the Attorney General makes with respect to the administrative search exception. Since California has no administrative scheme applicable to automobile repair shops, searches conducted pursuant to § 2805 are not any more administrative than they are airport searches. The Attorney General simply fails to get through the front door of the administrative search doctrine, because § 2805 searches are not "necessary to further [any] regulatory scheme." *New York v. Burger, supra,* 107 S.Ct. at 2644 (internal quotations omitted).

The threshold question in the analysis must be, when does the rigid Fourth Amendment requirement of a search warrant based on probable cause give way to the *Camara* balancing test applicable to administrative searches. In most cases, of course, where the administrative character of the search is plain on its face, there is no danger of confusion. In *Dewey,* an inspection was conducted to ensure compliance with the Federal Mine Safety Act. *See Donovan v. Dewey,* 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981). In *Camara,* a city housing inspector sought access to private residence in order to check certain electrical wiring for compliance with the city's housing code. *See Camara v. Municipal Court, supra,* 87 S.Ct. at 1729. For this reason, decisions of the Supreme Court in this area, while elaborating the constitutional limitations upon administrative inspection programs, do not directly address the threshold issue of when a search may be deemed to be administrative in the first place.

Some light, though obscured by other points of disagreement, was shed on this question in the debate between the majority and the dissent in *Burger.* The dissent contended that "the inspection became a search for evidence of criminal acts when all possible administrative violations had been uncovered." *New York v. Burger, supra,* 107 S.Ct. at 2657 (Brennan, J., dissenting). (Since the junkyard dealer in *Burger* admitted to the officers that he had not obtained a license nor kept a police book, the ensuing search of the dealer's inventory could not have uncovered any administrative violations not already known to the officers from the outset.) The majority, disagreeing with the dissent and with the New York Court of Appeals, held that the search of the dealer's inventory was administrative insofar as it served the goals of the regulatory scheme, even if no concrete administrative consequences could flow from the search. *See New York v. Burger, supra,* 107 S.Ct. at 2650–51.

A fair conclusion to be drawn from the majority opinion in *Burger* is that a search is administrative if it has as its aim the furtherance of a regulatory scheme, whether by uncovering specific regulatory violations or by serving the goals of the regulatory scheme. *See id.* at 2657 (Brennan, J., dissenting); *see also* 3 W. LaFave, *Search and Seizure,* § 10.2 (the dissent fairly characterizes the implication of the majority's holding). It must be observed that this broad formulation poses an obvious danger of legislative abrogation of the Fourth Amendment in instances where the goals of the regulatory scheme coincide with those of the penal scheme, so that a search may be deemed administrative though its consequences are entirely penal. The present case, however, does not pose this danger, because the Attorney General has failed to identify any non-penal scheme whose aims are served by § 2805 searches.

The Attorney General's attempt to characterize searches pursuant to § 2805 as

administrative inspections is belied by the absence of any administrative record-keeping, sanitary or other requirements that might be enforceable through § 2805. In California, inspecting officers have nothing to check or to "look for" except evidence of criminal possession of stolen property. This is not to say that a valid administrative search is rendered invalid if it uncovers evidence of a crime nor that the subjective motivation of the police officers in instituting the search is controlling, but only that the purpose of a valid administrative search must be the furtherance of a regulatory scheme—here lacking. *See New York v. Burger, supra,* 107 S.Ct. at 2644 (an administrative inspection must be necessary to further a regulatory scheme); *see also Michigan v. Clifford,* 464 U.S. 287, 104 S.Ct. 641 at 647, 78 L.Ed.2d 477 (1984) (evidence of criminal activity if discovered during a valid administrative search may be seized under the "plain view" doctrine); *U.S. v. Nechy,* 827 F.2d 1161, 1166–67 (7th Cir.1987) (motivation of those conducting the search is immaterial if the search is objectively reasonable).

The true purpose of § 2805 is not shrouded in any mystery, because the statute forthrightly admits that the searches are to be carried out "for the purpose of locating stolen vehicles." Cal.Veh.Code § 2805(a). Since the punishment in California for the possession of "stolen vehicles" is not an administrative reprimand but a criminal sanction, § 2805 gives the police an expedient means of enforcing the penal code without observing the guarantees of the Fourth Amendment.[2]

Although the administrative code may sometimes be enforced by warrantless inspections, the enforcement of the penal code summons the full panoply of constitutional safeguards. The state must obtain a criminal search warrant based on probable cause before entering private premises for the purpose of gathering evidence of criminal activity. *See Michigan v. Clifford, supra,* 104 S.Ct. at 647; *Michigan v. Tyler,*

*supra,* 98 S.Ct. at 1949; *cf. Abel v. United States, supra,* 80 S.Ct. at 690. This unremarkable proposition proves fatal to the Attorney General's case.

Since § 2805 does not serve the goals of any regulatory scheme, and its primary and, in fact, only purpose is to uncover evidence of criminal violations, § 2805 is fatally defective under the Fourth Amendment.

## IV. *The Constitutional Role of Administrative Schemes*

To be sure, a close inspection of the record would reveal that the search conducted in *Burger* is not much different from the searches of Cycle Works conducted in the present case under the authority of § 2805. In New York, as in California, police officers are authorized to inspect the inventory of the business in order to determine the possible presence of stolen items. *See New York v. Burger, supra,* 107 S.Ct. at 2650–2651; Cal.Veh.Code § 2805(a). In New York, inspecting officers can also peruse the police book to aid them in determining the vehicles' rightful ownership, but they can just as easily run the VIN numbers of vehicles found on the premises through a computer in their patrol car to determine whether any of the vehicles has been reported stolen, without the aid of the police book. This is in fact what was done in *Burger,* after the junkyard operator had failed to produce the police book. *Id.* at 2640. In California, police officers conducting a § 2805 search commonly rely on the same method as the New York police of transmitting by computer or by radio a vehicle's VIN number to check if it has been reported stolen. *See* Plaintiffs' Exhibit 2, at 89 (testimony of officer Kusch) ("one [method] is to check the vehicle identification number by radio to see if it's reported stolen"). The differences, therefore, between the searches of repair shops in California and of junkyard dealers in

---

**2.** Officer Kusch, who conducted one of the searches of Cycle Works, testified as follows:
Q: So you were there to conduct a criminal investigation; isn't that correct?

A: That's true. (Plaintiffs' Exhibit 2, at 86.)

New York will not be found in the manner of their execution.

It would be a mistake, however, to attach undue constitutional significance to the manner in which a search is executed. This is so, because two identical searches— one executed under the authority of a search warrant and the other without—are as far apart in the constitutional sense as the ridges of the Grand Canyon.

The constitutional role of a regulatory scheme in this context is to provide an "adequate substitute for a [search] warrant." *New York v. Burger, supra,* 107 S.Ct. at 2644 (internal quotations omitted). A valid administrative inspection program, "in terms of the certainty and regularity of its application," places the proprietor on notice that the regulatory scheme will be subject to effective enforcement through frequent inspections. *See id.; Donovan v. Dewey, supra,* 101 S.Ct. at 2539 (the proprietor "cannot help but be aware that his property will be subject to periodic inspections").

In the present case, proprietors of repair shops, who in California enjoy virtual freedom from regulation, "cannot help but be [un]aware" that any inspections of their businesses will be made outside the traditional means of criminal law enforcement. *Donovan v. Dewey, supra,* 101 S.Ct. at 2539. While one might conclude, as did the dissent in *Burger,* that one or another administrative scheme is too bare to serve as a constitutionally adequate substitute for a warrant, here a qualitative judgment is not needed: California has no administrative scheme whatever to play the role of a warrant substitute. Thus, there is only a superficial resemblance between the searches in New York and in California. Whereas New York searches were carried out under the authority of a warrant substitute, the California searches are simply warrantless.

California, of course, is free to address a pressing social problem such as automobile theft through both a penal scheme and an administrative scheme, but, as the Supreme Court noted in *Burger,* the two schemes will have different subsidiary goals even if they share the same "ultimate goal." *See New York v. Burger, supra,* 107 S.Ct. at 2649. In New York, for instance, the legislature enacted a record-keeping requirement for automobile dismantlers with the expectation that the need to keep comprehensive records will discourage dishonest dealers from entering the business in the first place and that frequent, unannounced inspections would further weed out dealers not in compliance with the record-keeping requirement. *See id.* at 2650. Thus, the presence of the police book in New York fulfills a vital conceptual precondition of a subsidiary administrative goal, apart from the ultimate goal shared by the penal and administrative schemes.

This distinction is not only empty conceptual but also real, because vastly different modes of enforcement are needed to ensure compliance with administrative and penal schemes. A record-keeping requirement, such as the police book, would be nigh impossible to enforce under a stringent warrant-probable cause standard, because noncompliance would not generally be known to anyone except the violator himself, nor would it leave any clues or traces observable by the police in public that could form the basis for probable cause to suspect a violation. For this reason, government's access to administrative records (and inventory, since entries in the police book would be meaningless unless compared against the inventory) is analyzed under a flexible constitutional standard. *Cf. See v. City of Seattle, supra,* 87 S.Ct. at 1740 ("minimal limitations on administrative action [ ] are constitutionally required in the constitutionally required in the case of investigative entry upon commercial establishments").

By contrast, the location of stolen property, which is California's sole interest under § 2805, can be accomplished through any of the traditional law enforcement techniques: the use of informants, physical surveillance, an undercover operation, or citizens' complaints. A trade in stolen property must of necessity involve many persons who are not employees of the repair shop. Their activities, unlike the inter-

nal maintenance of records, can be observed by the police, which observations can serve as the basis for obtaining a search warrant. In sum, where the peculiar needs of administrative enforcement are lacking, so is the justification for dispensing with the warrant requirement.

## V. *The Regulation of Repair Shops in California*

■ The Attorney General's invocation of the administrative search doctrine is unfounded in yet another respect. Even if § 2805 were designed to enforce a regulatory scheme, which surely it is not, a warrantless inspection program must still be restricted to a narrow class of pervasively regulated industries. In California, automobile repair shops are subject only to a meager licensing statute, which cannot be stretched to take the place of a pervasive regulatory scheme.

A distinction must be drawn here between automobile dismantlers and automobile repair shops. Automobile dismantlers in California, much like junkyard dealers in New York, are subject to substantial regulation by the state. An entire chapter of the Occupational Licensing and Business Regulations section of the California Vehicle Code is devoted to the licensing and reporting requirements for automobile dismantlers. *See* Cal.Veh.Code §§ 11500–11541. By contrast, no comparable regulatory scheme exists for automobile repair shops.[3] (Nor are repair shops a "new branch" of the long-regulated junkyard business. *See New York v. Burger, supra,* 107 S.Ct. at 2646.)

True, repair shops in California are required to register with the Automotive Repair Bureau. *See* Cal.Bus. & Prof.Code § 9884. However, such registration requirement has only a minimal probative value in showing that the automobile repair industry is pervasively regulated by the state. In California, in 1991, the most fertile imagination cannot conjure a business that may be lawfully operated without a license or registration. Accountants,[4] barbers,[5] funeral directors,[6] shorthand reporters,[7] dry cleaners,[8] and even trainers for guide dogs for the blind,[9] are required to be licensed or registered under the California Business & Professions Code. Unless every industry in California is to be deemed pervasively regulated, the requirement of a license, without more, cannot diminish the proprietor's constitutional guarantee against the unwarranted government intrusion into his private commercial premises.

Of course, the searches themselves under § 2805 cannot be cited as proof of pervasive regulation justifying elimination of the warrant requirement; that would be obvious bootstrapping. *See New York v. Burger, supra,* 107 S.Ct. at 2653 (Brennan, J., dissenting).

At oral argument, the Attorney General cited a regulation promulgated by the California Bureau of Automotive Repairs requiring repair shops to maintain invoices and written estimates for repair work done by them. *See* California Code of Regulations, Title 16, Reg. 3358 (Barclays, 1990). However, this regulation is directed at the protection of consumers from unscrupulous or unfair business practices, and is wholly unrelated to the goal of locating stolen vehicles. The lack of connection between Reg. 3358 and § 2805 is underscored by the regulation's failure to require a record of VIN numbers or registration papers of vehicles serviced by the repair shop. Presumably, it is the VIN number that would be helpful in tracing or locating stolen vehicles, not the repair shop's estimate on the

---

3. Although automobile repair inevitably involves some measure of "dismantling," such as the replacement of worn-out parts, the administrative code in California plainly reserves the term "dismantler" for persons engaged in the irreversible disabling of automobiles. *Cf.* Cal. Veh.Code § 11519 ("dismantled" vehicles may not be re-registered without a special inspection).

4. Cal.Bus. & Prof.Code § 5050.

5. Cal.Bus. & Prof.Code § 6546.6.

6. Cal.Bus. & Prof.Code § 7617.

7. Cal.Bus. & Prof.Code § 8016.

8. Cal.Bus. & Prof.Code § 9540.

9. Cal.Bus. & Prof.Code § 7210.

installation of a new muffler. Moreover, the Attorney General does not contend that the inspecting officers in this case or at any other time demanded to see the records required by Reg. 3358 while conducting a § 2805 search.[10]

In view of the automobile repair shops' relative freedom from regulation in California, § 2805 cannot be upheld as directed at a pervasively regulated industry. This is the statute's second fatal defect.

### Conclusion

Accordingly, for reasons stated in this opinion, plaintiffs' motion for summary judgment is granted, and the Attorney General is ENJOINED from conducting warrantless searches of automobile (or motorcycle) repair shops pursuant to Cal.Veh. Code § 2805(a).

In the end, the Court must note that nothing in this ORDER should suggest that California does not have a substantial interest in apprehending traders in stolen vehicles. The Court may take judicial notice that trade in stolen vehicles has long become a low-risk, high-profit growth industry in California, imposing enormous costs upon the motorists of this state. *See People v. Grey*, 23 Cal.App.3d 456, 462, 100 Cal.Rptr. 245 (1972). The California legislature may some day decide to address this problem by enacting a comprehensive regulatory scheme enforceable through warrantless administrative inspections, but it has not done so to date. Instead, what the legislature has done is give a blank check to the police to conduct at their whim criminal investigations upon the premises of every business establishment in this state that, in the course of doing business, happens to shelter automobiles on its premises.

IT IS SO ORDERED.

---

**10.** The Court's own research has identified a section of the Vehicle Code requiring repair shops to report to the police any vehicle showing bullet marks. *See* Cal.Veh.Code § 10653. There is no contention, however, that searches pursuant to § 2805 have ever been used to uncover unreported bullet-struck vehicles. Indeed, a connection between the location of stolen vehicles, which is the avowed purpose of § 2805, and the reporting of bullet-struck vehicles would not be so easy to draw, even if the Attorney General had attempted to do so.